# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : |
| Plaintiff, | : **Civil Action No. 3:13-cv-447** |
| v. | : : : |
| BANK OF AMERICA, N.A., BANC OF AMERICA MORTGAGE SECURITIES, INC., and MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. f/k/a BANC OF AMERICA SECURITIES LLC, | : : : : : : |
| Defendants. | : : : |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Securities and Exchange Commission (the "Commission"), files its complaint and alleges that:

### OVERVIEW

1.      This case involves violations of the federal securities laws by Bank of America, N.A. ("BANA"), its wholly owned subsidiary, Banc of America Mortgage Securities, Inc. ("BOAMS"), and its affiliate, the then Banc of America Securities LLC ("BAS"), now Merrill Lynch, Pierce, Fenner & Smith, Inc. (collectively, the "Bank of America Entities" or "Defendants").

2.      BANA, a wholly owned subsidiary of Bank of America Corporation ("BAC"), originated more than $90 billion in mortgage loans during 2007. BAC maintained some of these mortgage loans on its own corporate investment book and bundled other mortgage loans into securities, which are commonly known as residential mortgage-backed securities ("RMBS"). These RMBS were then offered and sold to investors through entities like BOAMS.

3.      The bundling of mortgages into RMBS and selling them to investors was described in BAC's public filings at the time as its "originate to distribute strategy."

4.      The Bank of America Entities misrepresented and omitted certain material facts regarding an RMBS, backed by more than $855 million of residential mortgages, known as BOAMS 2008-A, that was offered and sold in 2008.

5.      Specifically, in filings with the Commission, the Bank of America Entities portrayed BOAMS 2008-A as backed by "prime" mortgage loans, meaning that those loans had a higher credit quality than other types of mortgage loans, such as "subprime" or "Alt-A." Because BOAMS 2008-A was portrayed as being backed by prime mortgages, it attracted investors looking for safe, conservative investments.

6.     In fact, an unprecedented portion of the mortgage loans backing the security had been originated through mortgage brokers unaffiliated with the Bank of America Entities (referred to as the "wholesale channel" or "wholesale loans").

7.     By the time BOAMS 2008-A was being offered and sold to investors, the Bank of America Entities knew that wholesale channel loans were significantly more likely than loans originated by BANA employees to be subject to material underwriting errors, become severely delinquent, fail early in the life of the loan, or prepay – all of which negatively impact investors in RMBS.

8.     By the time the BOAMS 2008-A was being offered and sold, the then CEO of BAC had referred to wholesale loans as "toxic waste" and BANA had closed its wholesale channel.

9.     Although required to disclose this information under Regulation S-K and subpart Regulation AB of the Securities Act of 1933 ("Securities Act"), the Bank of America Entities failed to disclose the large concentration of wholesale loans as well as the substantial risk the concentration presented to investors.

10.    In addition, the filings with the Commission and the loan tapes provided to investors and rating agencies misrepresented that the mortgage loans backing BOAMS 2008-A were underwritten in accordance with BANA's guidelines. In fact, the Bank of America Entities knew or should have known that

3

a large percentage of the mortgage loans had significant deviations from BANA's guidelines, such as ineligible appraisals or falsified borrower income, and that they were not eligible for inclusion in BOAMS 2008-A.

11.     BAS also provided investors and the various rating agencies that rated RMBS with documents, known as loan tapes, that provided the key characteristics of the underlying mortgages.  The loan tapes provided for BOAMS 2008-A misrepresented material facts about the underlying mortgages.  For example, the loan tapes misrepresented debt-to-income ("DTI") and original combined loan-to-value ("OCLTV") ratios of the mortgages backing BOAMS 2008-A.  These misstated ratios within the loan tapes falsely portrayed the mortgage loans, and thus BOAMS 2008-A, as less risky.  BOAMS publicly filed with the Commission certain of these loan tapes containing material misrepresentations.

12.     As a result of the misstatements and omissions, the Bank of America Entities violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) & 77q(a)(3)].

13.     BAS and BOAMS also violated Section 5(b)(1) of the Securities Act [15 U.S.C. § 77e(b)(1)] by failing to publicly file with the Commission—and thereby make accessible to all investors—copies of loan tapes containing

4

information about the channel of origination for the loans underlying BOAMS 2008-A that were disclosed only to select investors.

14.     BAS and BOAMS have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Sections 5(b)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77(e), 77q(a)(2) & 77q(a)(3)].

15.     BANA has engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Sections 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) & 77q(a)(3)].

## JURISDICTION AND VENUE

16.     The Commission brings this action pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for disgorgement,  civil penalties and for other equitable relief.

17.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)].

18.     Defendants, directly and indirectly, made use of the mails, and the means and instruments of transportation and communication in interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

19.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act occurred in the Western District of North Carolina.  BANA's and BOAMS' principal place of business is in the Western District of North Carolina.

20.     Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## THE DEFENDANTS

21.     Bank of America, N.A. is a nationally chartered banking association headquartered in Charlotte, North Carolina.  BANA is a wholly owned subsidiary of BAC.  BANA is also an affiliate of BAS, which is also a wholly owned subsidiary of BAC.  BANA served as the originator, underwriter, and servicer for the entirety of the mortgage loans that comprised BOAMS 2008-A.  BANA is also the sponsor of BOAMS 2008-A.

6

22.    Merrill Lynch, Pierce, Fenner & Smith Incorporated, as successor to BAS, is a Delaware corporation and a Commission-registered broker-dealer headquartered in New York, New York.  It is a wholly owned subsidiary of BAC and is liable as successor-in-interest by merger to BAS.  BAS was the sole underwriter for BOAMS 2008-A and was the primary entity structuring and documenting the transaction.  As the underwriter, BAS offered and sold interests in BOAMS 2008-A to investors.

23.    Banc of America Mortgage Securities, Inc. is a Delaware corporation headquartered in Charlotte, North Carolina.  BOAMS is a wholly owned subsidiary of BANA that has no business operations beyond offering RMBS and related activities.  BOAMS functioned as the depositor for BOAMS 2008-A.

## THE PROCESS FOR ORIGINATING AND SECURITIZING MORTGAGE LOANS

24.    For the year 2007, BANA originated $93.3 billion in first lien mortgage production.  BANA originated these mortgage loans either through its direct or wholesale channels.

25.    Direct channels involve a BANA employee working with the borrower, either through BANA's website, at a BANA retail location such as a bank branch or over the phone, to complete the loan application package.

7

26.     In the wholesale origination channel, the borrower works with an unaffiliated mortgage broker in completing the loan application package. The mortgage broker is paid a fee upon closing of the loan.

27.     BAC maintained some of these mortgage loans on its own corporate investment book. Through its subsidiaries, BAC bundled other mortgage loans into RMBS that were then offered and sold to investors through entities like BOAMS.

28.     The bundling of mortgages into RMBS and selling them to investors is known as "securitizing" the mortgages and was described in BAC's public filings at the time as its "originate to distribute strategy."

29.      RMBS typically consisted of classes, referred to as tranches. Investors in RMBS received "certificates" representing an interest in a particular tranche of RMBS. The certificates are fixed income securities that entitle their holders to a schedule of payments of principal and interest at a specified rate.

30.     Each tranche of RMBS had a different seniority in the priority of repayment and a different rate of interest. RMBS were structured so that investors who owned certificates with a higher credit rating and a higher priority of repayment received a lower interest rate than certificates with a lower credit rating and a lower priority of repayment.

8

31.     RMBS can incur losses if a sufficient number of borrowers on the underlying mortgage loans default and the liquidation of the collateral securing those mortgage loans does not generate sufficient cash to cover the outstanding loan balances.  Losses are typically borne first by the subordinate tranches.  If the losses are sufficiently large, the entire principal balance of the subordinate tranche could be written off, resulting in no further payments to certificate-holders who invested in that tranche of RMBS.

32.     Because this structure increased the risk to subordinate tranches, the quality of the mortgages underlying RMBS played a particularly significant role in determining the price investors would pay for an interest in those tranches.

## BOAMS 2008-A

33.     BOAMS filed the prospectus supplement for BOAMS 2008-A with the Commission on January 29, 2008.  The offering was originally scheduled for December 2007, but was delayed due to a slowdown in the securitization markets.

34.     A majority of the certificates for BOAMS 2008-A were sold in a public offering that corresponded with the public filing of the offering documents. The remaining certificates were sold, in part, through private placements utilizing the same publicly filed information.  Those private placements were effected over the months following the public offering.

9

35.     BOAMS 2008-A was an RMBS backed by 1,191 residential mortgage loans, originated between mid-July and late November 2007, with an unpaid principal balance ("UPB") of approximately $855 million.  All of these mortgages were "Jumbo," meaning that the initial principal balance exceeded $417,000.

36.     The principal and interest payments on these mortgages were to flow through to the investors in the BOAMS 2008-A RMBS.

37.     BANA originated each of the 1,191 loans in the BOAMS 2008-A RMBS through either its direct or wholesale channels.

38.     BOAMS served as the depositor in the BOAMS 2008-A transaction. In that role, BOAMS acquired from BANA the 1,191 loans that BANA had originated and then "deposited" them into the BOAMS 2008-A RMBS.  BOAMS was the issuer of that RMBS.

39.     While the BOAMS 2008-A transaction was being structured, BAS marketed the transaction to potential investors and received commitments to purchase a portion of the certificates from certain investors.

40.     BOAMS then sold the certificates, representing interests in the various tranches of BOAMS 2008-A, to BAS.  BAS then sold the certificates to investors.

41.     In connection with the offering of the interests in BOAMS 2008-A to investors, BOAMS filed with the Commission a prospectus, prospectus

supplement, free writing prospectuses, a pooling and servicing agreement ("PSA") and related documents (collectively "the BOAMS 2008-A Offering Documents"). These documents disclose certain material facts about BOAMS 2008-A, as well as the mortgage loans backing BOAMS 2008-A.

42.    A prospectus is a disclosure document that describes a security to investors.

43.    A prospectus supplement contains additional information about the security that may not be disclosed in the prospectus.

44.    A free writing prospectus is a written communication, including an electronic communication, that constitutes an offer outside the statutory prospectus.

45.    A pooling and servicing agreement describes how pooled loans will be serviced and sets forth how proceeds and losses from those loans will be distributed to investors in the securitization.

46.    Beyond its role as underwriter and primary contact and information source for investors, BAS structured BOAMS 2008-A. BAS employees were the primary drafters of the BOAMS 2008-A Offering Documents and loan tapes that were disseminated to investors and publicly filed with the Commission.

11

47.     As described below, BAS provided various credit rating agencies with preliminary prospectuses and loan tapes so that those agencies could rate the certificates representing interests in BOAMS 2008-A that were offered and sold to investors.  Those documents contained inaccurate information.

48.     Substantially all of the certificates representing interests in BOAMS 2008-A received the highest credit rating from various ratings agencies.  These high credit ratings were based in large part on the perceived quality of the underlying mortgage loans backing BOAMS 2008-A and indicated that the certificates were a safe and conservative investment.

49.     The primary purchasers for the certificates were institutional investors that were required to purchase only securities that had the highest credit ratings.

50.     As of the June 2013 trustee report, BOAMS 2008-A had an 8.05% cumulative net loss rate, representing a loss of approximately $69 million – the greatest relative cumulative net loss rate of any comparable BOAMS securitization – and it continues to incur additional losses at a disproportionately advanced rate month over month.  It is anticipated that the future losses to the securitization will be approximately $50 million.

51.     The subordinate or "B" tranches of BOAMS 2008-A have been completely written off as the result of borrower defaults or prepayments of the underlying mortgage loans.

52.     By securitizing the mortgage loans into BOAMS 2008-A, the Bank of America Entities shifted the risk of loss of those mortgage loans from themselves to BOAMS 2008-A investors and thus avoided the losses incurred by the mortgages underlying BOAMS 2008-A.

## THE BANK OF AMERICA ENTITIES' FRAUDULENT CONDUCT

**I.      Undisclosed Risks Concerning Loans from the Wholesale Channel**

### A.     *Unprecedented Concentration of Wholesale Loans*

53.     The prospectus for BOAMS 2008-A incorporated by reference a BANA website containing performance information for prior securitizations involving "mortgage loans underwritten in accordance with [BANA's] general underwriting standards" (information generally referred to as "Static Pool Data").

54.     However, compared to prior RMBS offered and sold by BOAMS, BOAMS 2008-A had a disproportionately high level of wholesale loans.

55.     Specifically, BOAMS 2008-A was made up of 72% of wholesale loans in terms of UPB.  The prior RMBS sold by BOAMS in 2006 and 2007 and reflected in the Static Pool Data averaged only 41% UPB of wholesale loans.

13

56.     When BOAMS 2008-A was offered and sold, channel concentration was a key metric used by rating agencies and many RMBS investors.

57.     The supplemental prospectus contained a statement advising investors that the Static Pool Data "may not be indicative of future performance" but claimed that any variance would be caused by factors beyond BANA's control, such as variances in housing prices rather than a material difference in the composition of BOAMS 2008-A as compared to prior RMBS.

58.     Neither the BOAMS 2008-A Offering Documents filed with the Commission in connection with the offering of BOAMS 2008-A nor the Static Pool Data disclosed the disproportionately high level of wholesale loans underlying BOAMS 2008-A or the unprecedented nature of the concentration of wholesale loans in BOAMS 2008-A as compared to previous BOAMS offerings.

59.     Only a few investors were provided with information identifying the wholesale channel concentration of BOAMS 2008-A, and the Bank of America Entities did not publicly disclose the wholesale channel information.  As a result, not all investors had access to the same information and not all investors, or members of the public, were aware of the disproportionate amount of wholesale channel loans included in BOAMS 2008-A in comparison to previous BOAMS offerings.

14

60.     Moreover, even those investors who were provided with information about the wholesale channel concentration of BOAMS 2008-A were not told about the specific risks associated with the loans within BOAMS 2008-A.

## B.     *Specific Risks Associated with Wholesale Loans*

61.     When BOAMS 2008-A was offered and sold, the Bank of America Entities knew that the expected performance for wholesale loans had declined and presented materially higher risks of (a) deviation from BANA underwriting guidelines ("underwriting risk"), (b) default, and (c) prepayment, when compared to direct channel loans.

62.     In fact, on July 19, 2007, the then BAC CEO stated in BAC's Second Quarter 2007 earnings call that, compared to direct channel loans, broker sourced loans "tend[] to be toxic waste."

63.     The prospectus filed with the Commission in connection with the offering of BOAMS 2008-A was substantially similar to the prospectuses that were filed in connection with prior RMBS offerings by the Bank of America Entities.

64.     The similarities between these prospectuses, coupled with the references in the BOAMS 2008-A Offering Documents to the Static Pool Data (i.e. loan performance in prior RMBS) as a potential indicator of the performance of the loans in the BOAMS 2008-A, misleadingly portrayed the risks associated with

15

BOAMS 2008-A to be substantially similar to prior RMBS offered and sold by the Bank of America Entities.

65.     Given the disproportionately high level of wholesale loans backing BOAMS 2008-A and the demonstrated problems associated with such loans, the Bank of America Entities knew that BOAMS 2008-A presented substantially greater risks than prior RMBS offered and sold by the Bank of America Entities.

66.     Despite each of the Bank of America Entities being on notice of risks related to underwriting, defaults and churning discussed below, they made no effort to disclose to investors how those risks might affect the overall risk and or performance of BOAMS 2008-A.

i.      *Underwriting Risks*

67.     As part of the mortgage loan origination process, originators such as BANA examine whether potential borrowers and the proposed loan product meet certain criteria or standards, referred to as underwriting guidelines, such as the loan amount compared to borrower income and the loan amount compared to the value of the property securing the loan.  These standards are used to evaluate the borrower's ability to make the required principal and interest payments and the adequacy of the mortgage property as collateral for the mortgage loan.

16

68.     Compliance with underwriting guidelines is a material fact for RMBS investors because it provides some assurance that the borrowers will not default on the mortgage loans and, if there is a default, the collateral will be sufficient to cover the mortgage loan balance.

69.     Mortgage loans that do not comply with underwriting standards are generally perceived as riskier.  In fact, a bond trader at BAS who traded subordinate interests in RMBS (the "BAS Bond Trader") admitted that "he didn't feel comfortable" including mortgage loans in the BOAMS 2008-A loan pool if those loans did not comply with BANA's underwriting standards because those mortgage loans were riskier than mortgage loans that complied with BANA's underwriting standards.

70.     "Underwriting risk" is the risk that a loan has a material or serious deviation from the originator's underwriting standards.

71.     Mortgage loans originated through the wholesale channel present a higher underwriting risk than mortgage loans originated through direct channels. This is largely because the individuals responsible for wholesale channel loans, commonly referred to as mortgage brokers, have different financial incentives than a party affiliated with the originating institution.

72. Internal documents created by the Bank of America Entities shortly before the offer and sale of interests in BOAMS 2008-A confirm that loans originated through wholesale channels had significantly higher underwriting risks. Internal documents also show that there was a high correlation between mortgage loans that deviated from underwriting standards and mortgage loans that experienced delinquencies within a few months after origination.

73. Specifically, BANA's internal quality assurance group conducted monthly reviews of underwriting compliance by sampling and re-underwriting mortgage loan production. The monthly quality assurance reports ("QARs") prepared by the group were then circulated within BANA and to certain individuals involved in the RMBS program at BAS. The QARs tracked, among other things, trends in "serious or critical underwriting exceptions" by mortgage origination channel.

74. The QARs for the three most relevant months for the mortgage loans included within BOAMS 2008-A, September to November 2007, were circulated between November 19, 2007 and January 18, 2008. During this key period, the QARs identified a more than doubling of "serious or critical underwriting errors" for wholesale-originated loans.

18

75.    In fact, in the then most recent QAR distributed in January 2008, the exceptions for wholesale-originated loans had spiked such that it was evidencing 16% serious or critical underwriting exceptions. This contrasted with 7.6% serious or critical underwriting exceptions for all origination channels at BANA.

76.    Thus, at the time BOAMS 2008-A was being securitized with the greatest percentage of wholesale loans of any comparable offering, mortgage loans originated through wholesale channels were more than twice as likely to have serious or critical underwriting errors.

77.    BANA and BAS were aware of this risk when they were securitizing BOAMS 2008-A.

78.    The QARs were received and reviewed by, among others, a BANA employee who was also an officer and principal of BOAMS (the "BOAMS Principal.")

79.    The BOAMS Principal was a Senior Vice President of BANA, who at all relevant times, had responsibility for reviewing the offering documents for BANA and managing the BOAMS' filings with the Commission. Specifically, the BOAMS Principal (a) assisted with mortgage loan securitizations, (b) reviewed and signed public filings for RMBS, including the offering documents for BOAMS 2008-A and (c) was an agent of BAS responsible for investor relations.

19

80. Despite the BOAMS Principal and others at the Bank of America Entities being on notice of the significant increase in serious or critical exceptions documented in the monthly QARs, the BOAMS 2008-A Offering Documents contained no disclosure of the heightened risk of serious or critical underwriting exceptions for wholesale channel loans.

81. The QARs were also regularly received by the managing director of BAS who was responsible for creating and supervising BAS' RMBS program (the "BAS Managing Director"). The BAS Managing Director was a Senior Vice President of BANA. The BAS Managing Director also was the president and Chief Executive Officer of BOAMS.

82. At all relevant times, the BAS Managing Director was in charge of the BAS Mortgage Finance Group, responsible for the underwriting of BOAMS 2008-A. The BAS Managing Director had supervisory responsibility for structuring BOAMS 2008-A and for preparing the offering documents.

83. Neither the BAS Managing Director, the BOAMS Principal, or anyone else involved with BOAMS 2008-A, took any steps to ensure or even inquire into whether any of the loans in BOAMS 2008-A had been reviewed by BANA's quality assurance group.

20

## ii.    *Higher Default Risk for Wholesale Loans*

84.    Internal documents created by, and other information reviewed by, the Bank of America Entities also show that, around the time BOAMS 2008-A was being offered and sold, loans originated through wholesale channels had demonstrated a significantly higher risk of default than loans originated through direct channels.

85.    For example, by late 2007, the BAS Bond Trader had begun receiving an increase in inquiries and complaints from his customers suffering unexpectedly early incidences of default in recent BAS' RMBS.  In response, the BAS Bond Trader undertook a performance analysis for recent BAS underwritten RMBS.

86.    On December 10, 2007, the BAS Bond Trader transmitted his initial findings to the BOAMS Principal, the BAS Bond Trader's superiors at the RMBS desk at BAS and other BOAMS employees.  The email noted the decline in the performance of the 2006 and 2007 vintages of BANA-originated loans that had been securitized in RMBS offerings.  Attached to the transmittal email was a spreadsheet listing the 170 loans that had first payment defaults, early payment defaults, and severe delinquencies.

87.    In that email, the BAS Bond Trader stated:

[P]erformance of [BANA] originated loans has declined sharply…. It is imperative that we remain proactive in researching our skyrocketing delinquency issues and resolve swiftly and efficiently. We have been doing some analysis . . . into all BofA originated loans that were securitized by [BANA and BOAMS] over the course of 2007. In looking at the pay histories post securitization, what has become apparent is a number of loans with questionable payment histories that indicate possible instances of fraud.

88.     In response to that email, the BOAMS Principal acknowledged that "the performance of [recent BANA-originated mortgage loans] is worse than prior vintages."

89.     In a December 10, 2007 email to a member of BANA's quality assurance department, the BOAMS Principal acknowledged "the performance of [BANA-sponsored RMBS] deals is deteriorating at a rapid pace, we are attempting to find out the reason why so many loans are going [delinquent] so early in the deal's life."

90.     On January 15, 2008, shortly before the closing of the BOAMS 2008-A offering, the BAS Bond Trader sent employees of BANA (again including the BOAMS Principal) and BAS an email following up on his December email to the same group. This email updated the data contained in the BAS Bond Trader's earlier email and provided a more detailed analysis.

Case 3:13-cv-00447   Document 1   Filed 08/06/13   Page 22 of 48

91.     In this more detailed analysis the BAS Bond Trader communicated that of the BANA originated loans securitized in 2007 with questionable payment histories, 77% of the loans with first and early payment defaults originated from the wholesale channel and 80% of the loans flagged as severely delinquent originated from the wholesale channel.

92.     In concluding his email, the BAS Bond Trader wrote that while he appreciated that the wholesale channel was now closed, BANA must accept responsibility for its underwriting and origination errors that were causing losses to RMBS investors:

> [T]he poorly originated product from 2007 still needs ownership for the origination flaws and responsibility for the poor performance must be pushed back to the origination side of the business. The pricing provided for product from the securitization side of the business was never intended for early payment default or first payment default loans. The "'originate to distribute' model is broken . . . .

93.     In response to these emails from the BAS Bond Trader, the BOAMS Principal launched an internal investigation of the loans identified by the bond trader.

94.     The internal investigation initially entailed a review of whether any of the loans identified on the trader's spreadsheet had already been subjected to BANA's regular internal quality assurance review.

23

95.     Before the offering of BOAMS 2008-A closed, the BOAMS Principal learned from the initial steps of that internal investigation that BANA's internal quality assurance group had previously sampled and reviewed 35 loans on the bond trader's spreadsheet, and that the common element linking these loans was that the vast majority were originated through the wholesale channel.

96.     Despite the recognition by BOAMS Principal that the poor performance noted by the bond trader stemmed largely from loans originated through the wholesale channel, the BOAMS Principal did not evaluate whether the prospectus or other disclosure documents for BOAMS 2008-A should be revised so as to disclose the significant percentage of wholesale loans and the risks associated with those loans.

97.     Despite receiving both of the bond trader's emails on January 15, 2008, the BAS Managing Director did not ask anyone to perform any analysis whatsoever of the wholesale channel.  The BAS Managing Director did not request such an analysis despite the bond trader's focus on the wholesale channel and the BAS Managing Director's understanding that it would be necessary to conduct a much more focused analysis of the wholesale channel to determine if the wholesale channel was producing more severely delinquent loans,

24

98.     The BAS Managing Director also did not evaluate whether the problems with wholesale loans identified by the BAS Bond Trader warranted a revision of the BOAMS 2008-A disclosure documents.

99.     Reports created and distributed by BANA for 2007 mortgage loan originations ("Performance Reports") also showed that mortgage loans originated though the wholesale channel in the latter half of 2007 (i.e. the same period as the mortgage loans in BOAMS 2008-A were originated) were performing substantially worse than direct channel loans originated during the same time.

100.    The Performance Reports, among other things, tracked the number of mortgages originated by BANA in a particular quarter that had ever been 90 or more days delinquent (an "Ever 90" delinquency) during a particular quarter.

101.    The BOAMS Principal and BAS Managing Director had access to and regularly reviewed these Performance Reports.

102.    The Performance Report for the fourth quarter of 2007 was available to the BOAMS Principal and BAS Managing Director in January 2008, prior to the closing of the BOAMS 2008-A offering.

103.    That report showed that the percentage of wholesale loans originated in the third quarter of 2007 that experienced an Ever 90 delinquency within the first three months after origination was more than double the percentage of other

mortgages originated during that same period that experienced an Ever 90 delinquency within the first three months after origination.

104. The Bank of America Entities were well aware in advance of BOAMS 2008-A's issuance that the most severe performance problems for mortgage loans within BANA affiliated securitizations, at a more than 2:1 ratio, were coming from the wholesale channel.

105. No specific disclosure of the material performance risk presented by mortgage loans originated through wholesale channels was made to BOAMS 2008-A investors.

iii. *Higher Risk of Churning and Prepayment for Wholesale Loans*

106. The Bank of America Entities also knew that loans originated in the wholesale channel posed an additional risk when compared to the direct channel: churning and the resulting increase in prepayment.

107. Despite knowledge of the heightened prepayment risk, the Bank of America Entities failed to disclose this risk to investors.

108. "Churning" in the context of wholesale loan origination describes instances in which a mortgage broker approaches an existing customer who recently obtained a mortgage facilitated by the broker and convinces the customer to refinance the mortgage.

26

109.	While there may be an economic benefit to the customer as a result of decreases in interest rates, the mortgage broker's incentive is to generate an additional sales commission through the refinance.

110.	When a mortgage loan that has been securitized refinances, the principal balance is paid through the securitization cash flow structure as appropriate, but no additional interest payments are attributable to the loan.  As a result, prepayment lowers the return (or profit) that investors can earn.

111.	On December 14, 2007, BAS' RMBS trading strategy desk, a group that researched trends in the RMBS market, issued a report entitled "Outlook for the RMBS Market in 2008."  The report was distributed widely within BANA, BAS, and BOAMS and to select BAS customers.

112.	The RMBS trading strategy desk analyzed BANA originated wholesale channel loans, and found that such loans were "susceptible to 'churning' and 'planned refinancings' " by wholesale brokers who would approach borrowers to refinance their loans (i.e. repay the first lender with a loan from another lender) after the expiration of the "premium recapture" and "non-solicitation" periods.

113.	Both the "premium recapture" and the "non-solicitation" periods are generally set forth in the broker's compensation agreement with the lender.  The "premium recapture" period is the period of time in which the lender can recover

27

any premium paid to the broker for the loan if the loan prepays. The "non-solicitation" period is a specified period of time in which the broker is prohibited by the lender from soliciting the borrower to refinance the loan.

114.   Within the BAS report, wholesale loans had averaged 5% - 10% higher prepayment speeds over direct channel loans as measured under the industry metric of "constant prepayment rate" ("CPR").

115.   CPR is one of the primary metrics in evaluating and pricing RMBS, as the expected duration of payment of the underlying loans is materially impacted by the speed and volume of prepayment.

116.   The report shows that wholesale loans were likely to prepay faster than their direct channel counterparts because the brokers could earn further commissions by re-approaching their former clients and soliciting the client to refinance.

117.   Moreover, in November 2007, as the data for the trading desk prepayment study was being compiled, BAS changed its internal CPR modeling to specifically account for and include wholesale channel concentration data in order to project prepayment speeds.

118. By December 2007, the BOAMS Principal and BAS Managing Director had access to a statistical analysis evidencing the realized impact on CPR of wholesale channel churning.

119. Not only did BAS and BANA, in preparing and reviewing the offering documents, and BOAMS in filing the offering documents, fail to disclose to potential BOAMS 2008-A investors the risk of churning or the relevant statistics they had generated relating to churning, but they represented to investors that they were not aware of any statistics that could provide investors a basis to predict prepayments.

120. Specifically, in the prospectus supplement that BOAMS filed with the Commission, BOAMS stated that it was "not aware of any existing statistics that provide a reliable basis for investors to predict the amount or the timing of receipt of prepayments on the [m]ortgage [l]oans" underlying BOAMS 2008-A.

121. BOAMS 2008-A's performance in the first year after issuance evidences the churning warned of in BAS' December 2007 report.

122. Once wholesale loans in BOAMS 2008-A passed the three month "premium recapture" and "non-solicitation" period described in the BAS December 2007 report, such loans disproportionately prepaid compared to the direct channel loans securitized in BOAMS 2008-A.

123.   BOAMS 2008-A contained 588 (49.37% of the entire BOAMS 2008-A pool by number) wholesale loans that were originated in October and November of 2007.

124.   The large concentration of October and November 2007 wholesale loans magnified the importance of this information, as the three month premium recapture and non-solicitation periods would have just ended at the time of, or shortly after, the BOAMS 2008-A securitization closed in January 2008.

125.   In contrast, BOAMS 2008-A contained 127 (10.66% of the entire BOAMS 2008-A pool by number) direct channel loans originated in October and November of 2007 – a ratio of almost 5 wholesale loans to every 1 direct channel loan.

126.   After the first three months of securitization, the ratio for the refinance of those loans was 13.5 wholesale channel refinances to every 1 direct channel refinance.

127.   The disproportionate prepayment lasted for the first twelve months after securitization.  Though the prepayment ratio of wholesale loans to direct loans originated in October and November of 2007 decreased to 10:1, it was still double the ratio, 5:1, of all wholesale loans to direct loans originated in October and November of 2007.

## C.     _Failure to Provide Required Channel Information_

128.   By failing to disclose the wholesale channel concentration as well as the specific risks arising from the unique characteristics associated with the loans in BOAMS 2008-A, the Bank of America Entities did not comply with the disclosure requirements in Regulation S-K and subpart Regulation AB.

129.   Regulation S-K Item 503 [17 C.F.R. § 229.503] requires that an issuer "provide, under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."

130.   Item 503 further specifies that an issuer is not to "present risks that could apply to any issuer or any offering" and should instead "[e]xplain how the risk affects the … securities being offered."

131.   Moreover, by failing both to disclose the fact that BOAMS 2008-A consisted of 72% by UPB of wholesale loans and the specific risks associated with such a high concentration of wholesale loans, the Bank of America Entities did not comply with the disclosure requirements of subpart Regulation AB.

132.   Regulation AB Items 1103, 1104, and 1111 [17 C.F.R. §§ 229.1103, 229.1104, and 229.1111] require an issuer to provide information about the origination channel of the loans and the material characteristics of the asset pool.

31

Item 1111 of Regulation AB requires these disclosures irrespective of any risk they may pose.

133.    The Bank of America Entities did not provide such information.

## II.    False Statements Regarding Compliance with Underwriting Standards

134.    In addition to the material misrepresentations and omissions regarding the wholesale-originated mortgage loans and failures to comply with Securities Act Regulation S-K and subpart Regulation AB [17 C.F.R. § 229 et seq.], the prospectus for BOAMS 2008-A misrepresented to investors that the "[m]ortgage [l]oans will have been underwritten materially in accordance with … [BANA]'s underwriting standards…."

135.    In the PSA for BOAMS 2008-A, BANA made the misrepresentation that the mortgage loans underlying BOAMS 2008-A were "underwritten in accordance with the applicable [u]nderwriting [g]uidelines in effect at the time of origination with exceptions thereto exercised in a reasonable manner."

136.    As underwriter, BAS was responsible for drafting and reviewing the language within the Offering Documents that contained the false and misleading statements concerning compliance with underwriting guidelines.

137.    In connection with the offer and sale of interests in BOAMS-2008-A, the BOAMS Principal executed a certification on behalf of BOAMS that

represented, among other things, that the mortgages backing BOAMS 2008-A "conform in all material respects" to BANA's underwriting guidelines.

138.   Finally, the BOAMS Principal reviewed and signed the Underwriting Agreement for BOAMS 2008-A, and that agreement was filed with the Commission in connection with the offer and sale of BOAMS 2008-A to investors. In that agreement, BAS represented that the BOAMS 2008-A prospectus as filed did not "include any untrue statement of a material fact or omit any material fact required to be stated therein necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading"

139.   These representations were materially false.  In fact, a substantial percentage of the mortgages underlying BOAMS-2008-A contained material deviations from BANA's underwriting guidelines.

## A.   _Deviation from Guidelines_

140.   These material deviations include, among other things:  (1) misrepresented occupancy status; (2) ineligible appraisals; (3) failure to verify employment per BANA underwriting guidelines; (4) incorrect calculation of income or debts, without which the relevant mortgage would have exceeded applicable ratios; (5) unreasonable stated income; (6) missing, unsigned, or

33

incomplete Internal Revenue Service Form 4506-T; and (7) BANA indicators of potential mortgage fraud for which there is no available resolution.

141.  For example, in one mortgage loan file, the appraised value of the home was recorded as $781,000 as of August 17, 2007. That same home had sold for $501,000 on March 29, 2007, and the appraiser noted that there had been no material improvements since the property was last sold. The appraisal provided no explanation for the 55.8% increase in value over just 4½ months.

142.  In another loan file, the borrower represented that the loan was for the purchase of his primary residence. This residence, however, was located more than 2,600 miles from the borrower's stated place of employment. There is no explanation in the file of how the borrower's representations about his employment could be squared with his representations about the use of the loan to acquire a primary residence.

143.  In another loan file, the loan application indicates that the borrower was employed as an "Insurance Sales Producer" in Santa Barbara, California with 4 years of experience and a monthly income of $13,565. The salary for an Insurance Agent in the Santa Barbara, California metropolitan area at the time was $4,857 a month, according to accepted mortgage industry databases. There is no evidence in the loan files that the underwriter resolved this discrepancy.

34

144.    In another loan file, the loan application indicates that the borrower was employed as "Director" of a school in Los Angeles, California with 11 years of experience and a monthly income of $19,500.  The employment verification in the loan file, however, showed that the borrower was employed by the school as a "Chief Librarian."  The top wages for librarians in the Los Angeles, California metropolitan area at the time was approximately $7,000 per month, according to the Bureau of Labor Statistics. There is no evidence in the loan files that the underwriter resolved this discrepancy.

145.    Another mortgage loan that closed in September 2007 was included in the BOAMS 2008-A despite BANA's suspicion that the borrower had made fraudulent representations on the loan application.  In the loan application, the borrower represented that he intended to use the collateral as his primary residence. In a separate mortgage loan application, completed at the same time the first loan closed and processed by the same BANA loan officer, the same borrower represented that a different property would be his primary residence.  BANA was undeniably aware of this apparent fraud before the BOAMS 2008-A offering closed because, by December 2007, it brought these facts to the attention of law enforcement.

146.    Loans that were materially non-compliant with underwriting guidelines were 50% more likely to default and 20% more likely to prepay than the total pool population – each a significant negative impact on the relative performance of BOAMS 2008-A.

147.    The Bank of America Entities knew or should have known that the representations in the BOAMS 2008-A Offering Documents and related documents given to investors regarding the material compliance with underwriting standards were false.

148.    The QARs for August through November 2007, which corresponded to the exact periods in which the mortgage loans for BOAMS 2008-A were underwritten by BANA, were reviewed by representatives of each of the Bank of America Entities, including the BOAMS Principal and the BAS Managing Director.  These QARs revealed a significant percentage of the loans originated by BANA, which the Quality Assurance group had randomly sampled, had "serious or critical exceptions" in underwriting.

149.    Specifically, these reports showed that, of the mortgage loans randomly sampled that were originated between August and December 2007 and were not government insured or guaranteed, as much as 10.5% had "serious or critical underwriting exceptions."  The three most prevalent exceptions noted were

36

"borrower misrepresentation of employment," "borrower misrepresentation of stated income" and "occupancy issues."

150. The QARs for this period also document the disturbing fact that the overall underwriting exception rate for BANA originated loans had more than doubled between 2005 to 2007, such that by the point in time BOAMS 2008-A was being securitized more than 8% of the loans sampled for the year 2007 had "serious or critical exceptions" to underwriting. No disclosure of this more than doubling of "serious or critical exceptions" to underwriting was ever made to investors.

151. These trends were particularly relevant to BOAMS 2008-A, given its wholesale channel composition, as "serious or critical exceptions" in wholesale channel underwriting by November 2007 were at 16% – more than twice the overall "serious or critical exceptions" rate.

152. The BOAMS Principal admitted that, by the time the BOAMS 2008-A was being offered and sold, she and other BANA employees were aware of a growing trend in serious and critical underwriting exceptions in mortgage loans originated by BANA, but did not understand the cause of this trend.

153. Despite all of the evidence in the contemporaneous QARs indicating a material number of underwriting exceptions were almost certain to exist within the

loans underlying BOAMS 2008-A, BAS failed to engage in any independent due diligence to determine whether the loans in BOAMS 2008-A materially complied with BANA's underwriting guidelines.

154.   Historically, BAS had commissioned an independent due diligence testing of the loans underlying RMBS that it was underwriting, so that BAS could identify and remove loans that did not comply with guidelines from the loan pool and also to provide a basis for representations that the remaining loans complied with underwriting guidelines.

155.   For the three BOAMS RMBS as to which BAS performed this loan level due diligence in 2007, the independent findings identified that more than 40% of the mortgages sampled did not conform with BANA's underwriting guidelines, and that even after a review of all potential compensating factors, a material amount of the mortgages sampled needed to be removed from these prior BOAMS RMBS due to underwriting errors.

156.   Hence, at the point in time at which due diligence was most justified given the prior due diligence reports and the findings of the current QARs and was most likely to uncover and reveal material numbers of underwriting errors, the BAS Managing Director and others at BAS made the decision not to perform any due diligence on the mortgage loans underlying BOAMS 2008-A.

38

157. Had BAS engaged in such independent due diligence, had BAS employed adequate underwriting procedures, or had BAS employed adequate quality assurance procedures, BAS likely would have discovered the material number of loans in the BOAMS 2008-A loan pool that deviated from BANA's underwriting guidelines.

158. By representing in the BOAMS 2008-A Offering Documents that the loans in BOAMS 2008-A conformed with BANA's underwriting guidelines, when in fact a material amount of those loans did not, each of the Bank of America Entities made false and misleading representations to investors that understated the risks associated with BOAMS 2008-A.

**B.** *BANA's failure to comply with its underwriting guidelines when calculating data in its loan tapes*

159. Additionally, BANA's underwriting guidelines included prescribed methodologies for calculating certain ratios, such as DTI and OCLTV.

160. BANA failed to materially comply with its own underwriting guidelines in calculating these key ratios.

161. Specifically, approximately 29% of the loans securitized in BOAMS 2008-A contained DTI calculation errors of greater than 5%, and approximately

Case 3:13-cv-00447   Document 1   Filed 08/06/13   Page 39 of 48

7% of the loans securitized in BOAMS 2008-A contained OCLTV calculation errors of greater than 5%.

162.   The BOAMS 2008-A Offering Documents and loan tapes reported the DTI and OCLTV ratios, without disclosing that the ratios for many of the loans had been calculated in a manner that did not comply with BANA's underwriting guidelines.

163.   BANA's failures to comply with its own underwriting guidelines resulted in BANA making repeated misrepresentations regarding DTI and OCLTV that it knew would be distributed to investors and publicly filed with the Commission.

164.   BAS made misrepresentations to investors and ratings agencies by providing loan tapes and summary tables to investors and ratings agencies that contained these misrepresentations regarding DTI and OCLTV.

165.   BOAMS made misrepresentations to investors and others by publicly filing with the Commission loan tapes and summary tables to investors and ratings agencies that contained these misrepresentations regarding DTI and OCLTV.

166.   These misrepresentations of the Bank of America Entities served to mislead investors about the risks associated with BOAMS 2008.

40

167. BANA's underwriting procedures and quality assurance processes failed to uncover these systemic failures to accurately calculate DTI and OCLTV ratios.

## C. *Additional Misrepresentations in Loan Tapes by BAS*

168. In addition to underwriting errors contributing to false statistical information being communicated to investors, BAS incorrectly grouped and summarized BANA's OCLTV for the underlying loans and subsequently provided further incorrect information for OCLTV to investors and ratings agencies for a material number of BOAMS 2008-A loans.

169. As part of the underwriting and solicitation process, analysts at BAS' RMBS trading desk took the data received from BANA and compiled it into summary tables and investor focused loan tapes.

170. Investors used these materials to make pricing decisions and to internally model expected performance of the securitization, while the ratings agencies similarly used these materials to determine necessary credit enhancement and ratings for the pool.

171. BAS' summaries of OCLTV, however, inaccurately represented the OCLTV as found by BANA.

Case 3:13-cv-00447   Document 1   Filed 08/06/13   Page 41 of 48

172. When analysts at BAS calculated the OCLTV in the BOAMS 2008-A loan tape for investors, they improperly excluded the entire home equity line of credit or portions thereof for approximately 7% of the mortgage loans backing BOAMS 2008-A.

173. A significant majority of the loans whose OCLTV was miscalculated by BAS increased in OCLTV by 5% or more when corrected.

174. BAS overstated the number of loans with OCLTV at or below 80% and understated the number of loans with OCLTV above 80%.

175. 80% OCLTV is a threshold requirement for many of the applicable underwriting guidelines and mortgage insurance requirements.

176. By failing to accurately report the OCLTV of a material amount of the loans in BOAMS 2008-A, BAS made false and misleading representations to investors and rating agencies. As a result, a material amount of the BOAMS 2008-A pool was riskier than disclosed to both investors and rating agencies.

## III.   Failure to File Written Communications as Free Writing Prospectus

177. BOAMS 2008-A was structured after a long series of communications with potential investors.

178. BAS regularly communicated with potential investors until such investors were ready to commit themselves to investing in a transaction.

42

179.   BAS provided potential investors with various information concerning the proposed RMBS transaction that would become BOAMS 2008-A.

180.   This information would often include preliminary loan tapes.

181.   As discussions progressed with potential investors, BAS sent two entities a preliminary loan tape that included data identifying loan origination channels.

182.   A majority of the loans in the preliminary loan tapes became a part of the final structure of BOAMS 2008-A.

183.   BAS also provided loan tapes containing origination channel information to Standard & Poor's, who was responsible for rating BOAMS 2008-A.

184.   Neither BOAMS nor BAS filed with the Commission all of the preliminary loan tape information that BAS shared with the potential investors.

185.   The potential investors who received these loan tapes committed to purchasing BOAMS 2008-A shares prior to the time the structure was finalized.

186.   BOAMS and BAS failed to file with the Commission any loan tapes at any point in time that contained the percentage of the mortgage loans underlying BOAMS 2008-A that were originated through the wholesale channel.

43

187. The loan tapes provided by BAS trading desk employees to certain investors via email are written communications constituting free writing prospectuses under the Securities Act.

188. BOAMS was required to file those loan tapes with the Commission through EDGAR in order to use them as written communications.

189. BOAMS did file a different loan tape on EDGAR as a free writing prospectus that omitted the wholesale origination channel information, which made the loan tape that was filed materially misleading.

190. BAS did not have adequate procedures in place to ensure that all communications with investors were reviewed for purposes of complying with the Commission's filing requirements.

## COUNT I—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

191. Paragraphs 1 through 190 are hereby realleged and are incorporated herein by reference.

192. From at least November 2007, through at least January 2008, Defendants, in the offer and sale of the securities described herein, by use of means

and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a. obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b. engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

193. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT II—FAILURE TO FILE PROSPECTUS

### Violations of Section 5(b)(1) of the Securities Act
### [15 U.S.C. §§ 77e(b)(1)]

194. Paragraphs 1 through 190 are hereby realleged and are incorporated herein by reference.

45

195. From at least November 2007, through at least January 2008, BAS and BOAMS, directly or indirectly made use of means and instruments of transportation or communication in interstate commerce or of the mails to carry or transmit a prospectus relating to a security with respect to which a registration statement had been filed without ensuring that the prospectus met the requirements of Section 10 of the Securities Act.

196. By reason of the foregoing, BAS and BOAMS, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 5(b)(1) of the Securities Act [15 U.S.C. § 77e(b)(1)].

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commission respectfully prays for:

### **I.**

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendants committed the violations alleged herein.

### **II.**

A permanent injunction enjoining BANA, its officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. §77 q(a)].

46

**III.**

A permanent injunction enjoining BAS, BOAMS, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Sections 5(b) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(b) and 77 q(a)].

**IV.**

An order requiring the disgorgement by Defendants of all ill-gotten gains, losses avoided, or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

**V.**

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] imposing civil penalties against Defendants.

**VI.**

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

The Commission demands a jury trial.

Case 3:13-cv-00447   Document 1   Filed 08/06/13   Page 47 of 48

Dated: August 6, 2013

Respectfully submitted,

*/s/ Kristin B. Wilhelm*
William P. Hicks
Associate Regional Director
Georgia Bar No. 35169
Email: hicksw@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Email: loomism@sec.gov

Kristin B. Wilhelm
Senior Trial Counsel
Georgia Bar No. 759054
Email: wilhelmk@sec.gov

Mark Eric Harrison
Senior Counsel
Massachusetts Bar No. 640487
Email: harrisonm@sec.gov

COUNSEL FOR PLAINTIFF
Securities and Exchange Commission
950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, Georgia 30326-1382
Tel: (404) 842-7600
Fax: (404) 842-7666